## CONSTRUCTION OF CONTRACT GRANTING USE OF GROUND FOR UNIVERSITY PURPOSES.

[Superior Court·of Cincinnati, General Term.]

THE BOARD OF DIRECTORS OF THE UNIVERSITY OF CINCINNATI
v. THE CITY OF CINCINNATI, BY CHARLES·J. HUNT,
CORPORATION COUNSEL THEREOF.

.Decided, April 11, 1903.

*Physical Culture a University Requirement—Proper Use of University
Grounds—Construction of Agreement Granting Such Use.*

1. A contract granting to its university the necessary ground for university purposes by the city authorities, includes physical culture as a necessary university purpose.
2. The construction of such an agreement must be effective to carry out to its fullest extent the intention of the contracting parties, in order to attain the object had in view by them.
3. The rule governing such construction is that the words used are to be construed, not according to their mere ordinary general meaning, but according to their ordinary meaning as applied to the subject matter with regard to which they are used; and equally the construction ought to be with reference to the object to be accomplished by the contracting parties, and to keep in view all conditions existing.

SPIEGEL, J.; FERRIS, J., concurs; DEMPSEY, J., dissents.

The plaintiff in error, the Board of Directors of the University of Cincinnati, alleges that there is error in the judgment rendered in the ·Special Term of the Superior Court, in holding that said Board of Directors have no right to an exclusive control of its athletic field under an agreement entered into on the 22nd day of October, 1889, ·between the City of Cincinnati and the University of Cincinnati, and prosecutes error to that decision to this General Term.

The learned judge below held, in substance, as follows:

"1. The agreement between the City of Cincinnati and the University of Cincinnati, whereby the latter was granted the privilege of using forty-three acres of land in Burnet Woods Park for university purposes, it being expressly provided that the remainder

of said forty-three acres not occupied by the buildings of the University shall remain open to the public as a part of Burnet Woods Park forever, does not empower the University to exclude the public from its athletic field by building a fence around it.

"2.   The authority of the Board of Public Service over park property is limited to the improvement, care and control of said parks, and inasmuch as a permit from the board to the University to build a fence around its athletic field for the purpose of excluding the public therefrom is in effect a conveyance by the board to the University of that part of the land embraced within the fence, such a permit is beyond the powers conferred on said board by statute."

The agreement referred to relative to the occupancy of a part of Burnet Woods Park by the University of Cincinnati was entered into by the city and university authorities, pursuant to an ordinance, numbered No. 4266, passed by the City Council of Cincinnati under the authority of Section 4103 of the Revised Statutes of Ohio, authorizing it to "set apart or appropriate as a site for the buildings and grounds of the University  *  *  *  any public grounds of the city, not especially appropriated or dedicated by ordinance to any other use or purpose, any law to the contrary notwithstanding."   The agreement, omitting the description of the property, is as follows:

*     *     *     *     *     *     *     *     *     *

"That the party of the first part, for and in consideration of one dollar by it received from the party of the second part, and the covenants of the party of the second part hereinafter set out by it to be performed, does hereby covenant and agree to and with the party of the second part that the last-named party may erect a university building and such other buildings as may be incidentally connected therewith, and forever afterward maintain and control the same for the purposes hereinafter named, upon the following described lot of land:

*     *     *     *     *     *     *     *     *     *

"That the said University of Cincinnati may erect on said lot above described its main building at whatever point it may select, and it shall have exclusive control in and over so much of said lot as lies within a radius of one hundred feet of said main building; provided, that said limit of one hundred feet does not ex-

tend beyond any line of said first described lot or tract of ground. But it is expressly agreed and understood that the remainder of said tract of 43.164 acres just above described not occupied by buildings for said university purposes is to remain open to the public as a part of Burnet Woods Park forever. The said party of the second part shall have the right to use the remainder of said above described tract for all proper university purposes, and to build roads, lay out grounds, plant trees and to otherwise beautify and improve said grounds, subject always to approval by the Board of Public Affairs of said party of the first part.

* * * * * * * * * *

"Said party of the second part agrees and covenants that within five years from the date of the execution of this agreement they will have expended at least one hundred thousand dollars in the construction of the buildings and other improvements upon the above described lot or tract of ground for their university purposes, otherwise this agreement to be null and void without proceedings in forfeiture therefor; and that they will keep said improvements in repair, and forever after maintain and control said buildings so constructed upon said lot, together with the said grounds, for university purposes.

"That in case of failure of said University of Cincinnati to make substantial compliance with the conditions and stipulations in this agreement, or in case said university shall at any time thereafter fail to maintain and keep up a university for educational purposes, or shall fail to continue and maintain the grounds not actually occupied by buildings for university purposes, the same shall, at the option of the city, become void, and the city may thereupon retake and retain the sole and exclusive control of said premises."

In accordance with this agreement, the university authorities took possession of the property therein named, erected its main building and others, and, in 1901, laid out an athletic field of four acres, part of the forty-three acre tract, for the physical culture of its students, and on November 4, 1902, obtained a permit from the Board of Public Service, to build a fence around said athletic field, said Board of Public Service, under Section 2506 of the Revised Statutes of Ohio, having imposed upon it "the improvement, care and control of all parks."

On November 5, 1902, the corporation counsel, in obedience to the request of the board of legislation, brought this suit against

the Board of Directors of the University, to enjoin them from building said fence, which suit was determined in his favor by the court below.

The determination of this cause depends upon the construction to be given to the agreement entered into between the city and university authorities. It must be a construction effective to carry out to its fullest extent the intention of the contracting parties, in order to attain the object had in view by them. This is in accordance with the golden rule for construing all written engagements, laid down by Lord Wensleydale in *Grey* v. *Pearson* (6 House Lords Commons, 61) in 1857, in the following items:

"I have been long and deeply impressed with the wisdom of the rule, now, I believe, universally adopted at least in the courts of law in Westminster Hall, that in construing wills, and indeed statutes, and all written instruments, the grammatical and ordinary sense of the words is to be adhered to unless that would lead to some absurdity, or some repugnance or inconsistency with the rest of the instrument, in which case the grammatical and ordinary sense of the words may be modified, so as to avoid that absurdity and inconsistency, but no further."

This was preceded by the rule laid down by Chief Justice Abbott, in 1822 in *Rex* v. *Hall* (1 Barnewall and Cresswell, English King's Bench Reports, p. 122), namely:

"The meaning of particular words in Acts of Parliament, as well as other instruments, is to be found not so much in a strict etymological propriety of language, nor even in popular use, as in the subject of occasion on which they are used, and the object that is intended to be obtained."

These rules have been followed in our country, and are today the guide laid down by all American text-writers, the latest of whom, Mr. Endlich, lays down the rule as follows, Section 73:

"The words of a statute are to be understood in the sense in which they best harmonize with the subject of the enactment and the subject which the Legislature has in view. Their meaning is found not so much in a strictly grammatical or etymological propriety of language nor even in its popular sense, as in the subject

or in the occasion on which they are used, and the object to be
obtained.   That is, in the construction of a statute, as in that
of other instruments, words are to be understood, not according to
their more ordinary, general meaning, but according to their or-
dinary meaning as applied to the subject-matter with regard to
which they are used, unless indeed there be something requiring
them to be read in a sense which is not their ordinary sense in the
English language as so applied.   It is a general and very sound rule,
applicable to the construction of every statute, that it is to be taken
in reference to its subject matter.   And equally the construction
ought. to be with reference to the object to be accomplished by
the act, and to keep in view all conditions existing."

   In following these rules it becomes the duty of the court to
look to all the circumstances which the parties to the instrument
had before them at the time and were themselves contemplating,
as found, not by any extrinsic evidence, but by evidence afforded
by the instrument itself, as well as those admitted by the pleadings
in the case below.
   A university is an institution organized and incorporated for the
purpose of imparting instruction in the higher branches of litera-
ture, sciences, art, and empowered to confer degrees in the several
arts and faculties, as in theology, law, medicine, music, etc.   It
is admitted by the demurrer, sustained below, that, in the lan-
guage of the answer of the University, "an athletic field is a well
recognized part of every modern college or university, and that
the part of the forty-three acres which it is contemplated to en-
close with the proposed fence, is to be used for the well-known
and defined university purpose, to-wit: athletic purposes; that
on this field there will be played foot-ball games, base-ball games,
and all track events, as are held in other universities, to-wit:
Harvard, Yale, Columbia, Cornell, University of Pennsylvania,
Ohio State University, Western Reserve University, and others
too numerous to mention."
   It is admitted, therefore, by the pleadings, that physical cul-
ture was contemplated by the contracting parties as one of the
elements of a university purpose.   Does the agreement cited grant
or withhold the means to carry out this purpose?   To determine
this, it becomes necessary to read the entire instrument and construe

it in the light of the intention of the contracting parties to carry
out the object they had in mind, to-wit: the up-building of a
university, in the fullest sense of its meaning, for the city of Cin-
cinnati.   The learned judge below bases his construction of the
instrument entirely upon its interpretation of the word "building."
In this we think he took too narrow a view of the instrument,
and erred.   That part of the agreement which provides for the
erection of a main building by the University, giving it exclusive
control over a lot lying within a radius of one hundred feet of
said building, and keeping open forever to the public the remainder
of the tract of land, not occupied by buildings for university pur-
poses, contains the further provision that "the said party of the
second part shall have the right to use the remainder of said above
described tract for all prior university purposes, * * * subject
always to the approval of the Board of Public Affairs of said party
of the first part."

It is admitted by the city that physical culture is a proper uni-
versity purpose.   The right of the University, therefore, under
the clause just cited, to use such part of the remainder of the
tract, as may seem necessary to its authorities, for a proper univer-
sity purpose, to-wit: an athletic field for physical culture, can not
be doubted.   It has obtained the approval of the Board of Public
Service, the successor to the Board of Public Affairs.   There can
be no divided control over a proper university purpose.   That
is vested solely in the university authorities, and not concurrently
with the public.   Such a construction would be fatal to the object
had in view by the contracting parties, and contrary to the cove-
nant contained in said agreement, which provides that they (the
university authorities) "will keep said improvements in repair,
and forever after maintain and control said buildings so constructed
upon said lot, *together with the said grounds, for university pur-
poses.*"

Thus construing the agreement, the grant is made effective,
within the meaning of the contracting parties.   This is in accord-
ance with the rule laid down by our Supreme Court in *The German
Fire Insurance Co.* v. *Roost*  (55 O. S., 581) :

"The meaning of a contract is to be gathered from a considera-
tion of all its parts, and no provision is to be wholly disregarded,
as inconsistent with other provisions, unless no other reasonable
construction is possible."

This leaves open to the public the remainder of the forty-three
acres tract, not occupied by buildings or grounds for university
purposes, and vests the exclusive control of said athletic field, sur-
rounded by a fence, in the university authorities.

But even determining this case upon the narrowest construction
to be given the agreement, namely, the interpretation of the word
"building," in accordance with the well-known rules of interpreta-
tion of words, heretofore cited by us, we need not resort to any
forced interpretation in order to harmonize the different parts
of the agreement with each other, in the light of the object
sought to be attained by both parties to the agreement.
The word "building" has two meanings: One, which is the
popular one, now meaning a structure of the nature of a
house built where it is to stand; the second—the original one,
and still retained as the legal meaning—that which is built. These
are the definitions given by Dr. Murray, in his new English Dic-
tionary, now in course of preparation. The same meaning is given
the word in the Century Dictionary: "A fabric built or con-
structed; a structure, an edifice; as commonly understood, a house
for residence, business, or public use, or for shelter of animals or
storage of goods. *In law,* anything erected by art, and fixed upon
or in the soil, composed of different pieces connected together, and
designed for permanent use in the position in which it is so fixed,
is a building. Thus, a pole fixed in the earth is not a building,
but a fence or wall is."

And we might say, *passim,* that the original etymological deriva-
tion of the word building does not denote a structure alone, but
connotes both a farm as well as an abode; the Icelandic *bol* meaning
a farm or an abode, the Danish *bol* meaning a small farm, and the
Swedish *bol, bole,* meaning a farm, dwelling or house.

We believe, therefore, that the legal definition of the word
"building," instead of its popular one, was in the minds of the con-

tracting parties when entering into this agreement, in order to carry out the object to be accomplished, namely the up-building of a university.

This is in accordance with the rule of interpretation already cited by us, namely, that "the meaning of particular words is to be found not so much in a strict etymological propriety of language, nor even in popular use, as in the subject or occasion on which they are used, and the object that is intended to be obtained." (*Rex v. Hall,* 1 B. & C., 122.)

The judgment below must be reversed, and the exclusive control of the athletic field vested in the university authorities.

DEMPSEY, J.

I think the judgment below ought to be sustained on the opinion of the trial judge.

*Max B. May,* for plaintiff in error.
*Charles J. Hunt,* for defendant in error.